UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILLIAM SPARROW,

    Plaintiff,

    v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,

    Defendant.

Civil Action No. 22-2216 (JDB)

## MEMORANDUM OPINION

Bus operator William Sparrow alleges that his employer, the Washington Metropolitan Area Transit Authority ("WMATA"), discriminated and retaliated against him for taking leave to care for his newborn daughter. Specifically, he claims that WMATA's parental leave policies unlawfully discriminate between men and women in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). He further alleges that WMATA interfered with his right to take protected family leave in violation of the Family and Medical Leave Act, 29 U.S.C. § 2611 et seq. ("FMLA"), and that WMATA retaliated against him for requesting leave, as well as for reporting his concerns about WMATA's allegedly discriminatory policies. Before the Court is WMATA's motion for summary judgment. For the following reasons, the Court will grant WMATA's motion for summary judgment on Sparrow's retaliation claims and deny WMATA's motion for summary judgment on Sparrow's Title VII and EPA discrimination claims and FMLA interference claim.

## Background

### I.   Factual Background

Sparrow is a bus operator for WMATA, where he has worked since June 18, 2007. Def. WMATA Statement of Material Facts Not in Dispute [ECF No. 19-1] ("Def. SMF") ¶ 1; Pl.'s

Resp. to Def. SMF & Suppl. Facts [ECF No. 20-1] ("Pl. SMF") ¶ 1.  As a bus operator out of the Landover Division, Sparrow is a member of Local Union 922 of the International Brotherhood of Teamsters ("Local 922"), and his contract is governed by a collective bargaining agreement between Local 922 and WMATA.  Def. SMF ¶ 2–3; Pl. SMF ¶ 2–3.

During the summer and fall of 2020, Sparrow requested time off, pursuant to the FMLA, to provide care leading up to and following the birth of his daughter.  See Def. SMF ¶¶ 9–10; Pl. SMF ¶¶ 9–10.  Under the FMLA, an employee is entitled to twelve weeks of leave within one year of "the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(A).  FMLA leave is job-protected, meaning the employer must restore the employee to his or her prior position or an equivalent position upon return to work.  Id. § 2614. But the FMLA does not require employers to pay their employees during the period of leave.  Id. § 2612(d)(1).  And employers may permit or require their employees to use paid vacation or sick leave during FMLA leave.  Id. § 2612(d)(2).

Sparrow's parental leave rights are further governed by WMATA's internal policies and by the Local 922 collective bargaining agreement.  See Def. SMF ¶ 3; Pl. SMF ¶ 3.  WMATA's policies permit employees to take extended periods of FMLA leave as well as intermittent leave for qualifying reasons, including the birth of a child.  Policy/Instruction 7.5.7/1 [ECF No. 19-6] ("FMLA Policy") §§ 5.01(b), 5.04.  At WMATA, "FMLA leave is unpaid leave . . . [that] does not entitle an employee to paid leave other than the paid leave (e.g., sick or annual) earned by the employee."  Id. § 5.08(a).  "If an employee is granted FMLA leave for an employee's own serious health condition," WMATA policy provides that the employee must "concurrently use the appropriate accrued paid leave (e.g., sick or annual)."  Id. § 5.08(a)(2).  By contrast, "[i]f an employee is granted FMLA leave for any qualifying reason other than an employee's own serious health condition, any accrued paid annual leave must run concurrently with the FMLA leave to the

fullest extent, unless limited by an applicable [collective bargaining agreement] or [WMATA] policy." Id. § 5.08(a)(1). That is, as a general matter, if an employee is taking FMLA leave to care for another, he or she is not allowed to utilize sick leave during that time, but must use up his or her vacation leave instead.

The collective bargaining agreement further provides that WMATA "shall grant to employees up to six months of [unpaid] maternity leave following the date of childbirth. Employees may use available vacation and/or sick leave (if absence is for medical reasons)." Agreement Between WMATA & Local 922 [ECF No. 20-13] ("Local 922 CBA" or "CBA") § 16(n). "Female employes shall be granted maternity leave without loss of seniority provided they provide the [WMATA] two weeks' notice of their intent to return to work and that they are available for work upon release from their physician but no later than six months after delivery." Id. § 9(b). The CBA further permits all members "to use up to two (2) days of paid sick leave per year for absence caused by illness or injury of dependent children or spouse." Id. § 16(o).

On July 2, 2020, Sparrow requested FMLA leave to care for a newborn child who was due in August. Deposition of William Sparrow [ECF No. 19-3] ("Sparrow Dep.") at 36. Sparrow was approved to take intermittent FMLA leave on August 1, September 2, and September 8 of that year, as well as continuous FMLA "birth and bonding" leave from September 28 through November 17. Def. SMF ¶ 9; Pl. SMF ¶ 9. He misunderstood based on his communications with WMATA that he "could use sick and vacation time to receive pay while away from work." Decl. of William Sparrow [ECF No. 20-6] ("Sparrow Decl.") ¶ 1. Ultimately, Sparrow returned to work early on October 26, 2020. Def. SMF ¶ 10; Pl. SMF ¶ 10. The overarching reason for the early return-to-work is undisputed: he was having issues with his pay. See Sparrow Decl. ¶¶ 2–3; Sparrow Dep. at 43 ("I only came back because I noticed that my leave was being depleted."); Reply at 2. However, the details are more contested.

According to Sparrow, during his FMLA leave and thereafter, he received a series of irregular paychecks that included substantial deductions of vacation and sick leave and other indications of "no pay."  The first unusual pay stub was dated September 30, 2020, and Sparrow contends that pay issues persisted through July 2022.  See Sparrow Decl. ¶¶ 2–4; Opp'n at 10.  For example, on September 30, 2020, Sparrow received a pay stub for $0.00 despite working most of September.  Sparrow Decl. ¶ 2.  On October 7, he received one paystub for $0.00, which indicated that 8 hours of sick leave and 32 hours of vacation time were used, and another paystub for negative $4,993.69.  Id.  Subsequent paystubs in October were missing "vacation overtime," and on November 4, 2020, he received another $0.00 paycheck.  Id. ¶ 3.

WMATA's explanation for these pay discrepancies is that Sparrow's continuous FMLA leave was "inadvertently coded as 'Family Medical Leave Sick,' when in fact, this absence should have been coded as 'Family Medical Leave Vacation'" because he was caring for a child, and not for himself.  Decl. of Sharon L. James [ECF No. 19-2] ¶ 7.  "[T]he FMLA Department, along with Payroll, corrected the issue and Mr. Sparrow was paid with whatever vacation leave he had at the time."  Id.  According to WMATA, further reduced wages resulted from Sparrow's absences from work, for which he lacked vacation leave or failed to request vacation leave.  Id. ¶¶ 8–11.  Sparrow disputes this explanation because it does not explain the "negative paychecks," but he does not offer any evidence to contradict WMATA's explanation for the paystubs.  See Pl.'s Suppl. Br. [ECF No. 24] at 5.

Upon his return to work, Sparrow had a "conversation with management" about pay issues during his leave.  Sparrow Dep. at 43.  He subsequently had various issues with his supervisors. In January or February 2021, Sparrow claims he was "put under investigation after leave that was preapproved" by his supervisor, for a court appearance to obtain a firearm permit.  Sparrow Decl. ¶ 5; Sparrow Dep. 66–70.

In March 2021, Sparrow contacted the WMATA Office of Inspector General ("OIG") about his human resources concerns.  See Def. SMF ¶ 11; Pl. SMF ¶ 11.  Sparrow claims that around August 2021, when his supervisors found out Sparrow "had been called to report to OIG," he "received a suspension for suspicion of reports made to [OIG]."  Sparrow Decl. ¶ 5.  On October 14, 2021, the WMATA OIG issued a report following Sparrow's OIG complaint.  OIG Report of Investigation [ECF No. 19-11] ("OIG Report") at 1–2.  The report concluded that Sparrow's human resources concerns were "outside the purview of the OIG," but that a surreptitious recording he included in his complaint potentially violated Maryland criminal law and internal WMATA policy.  Id.  The OIG Report was forwarded to "WMATA management."  Id. at 2.  On November 12, 2021, Superintendent of Bus Service Operations Letroy Baker imposed a three-day suspension against Sparrow for violating internal rules by making an "improper recording."  Memorandum [ECF No. 19-12] at 1; see Def. SMF ¶ 19; Pl. SMF ¶ 19.

Additionally, Sparrow claims that he did not receive a scheduled November 2021 raise until February 2022, and that, throughout the time period from 2020, WMATA supervisors improperly placed him on leave without pay and tried to make him sign warning paperwork for attendance violations "that either never occurred or had been approved previously," and placed him in an attendance program. Sparrow Decl. ¶ 6; Sparrow Dep. at 65 (contending that his supervisor, Sharon James, "suspended [him] from work" and "just put down leave without pay so it wouldn't reflect it"); see Attendance Paperwork [ECF No. 20-12] at 6, 13, 18.

## II.    Procedural Background

On June 21, 2021, Sparrow made an initial inquiry with the Equal Employment Opportunity Commission ("EEOC").  Def. SMF ¶ 12; Pl. SMF ¶ 12.  In the inquiry, Sparrow reported that after seeking FMLA leave for the birth of his child, he faced numerous issues with his pay, was investigated for taking time off for a court appearance, and was "subjected to

continuing harassment from [his] supervisors on what appear[ed] to be an attempt to end [his] employment." EEOC Inquiry [ECF No. 19-13] ("June 2021 EEOC Charge") at 3. Sparrow was interviewed by the EEOC. See id. at 6–9. About a month later, the EEOC declined to pursue his case and issued a right-to-sue letter. Id. at 9. On September 2, 2021, the EEOC sent a notice of Sparrow's discrimination charge to WMATA stating that Sparrow had made allegations of discrimination under Title VII and the EPA. Id. at 10–11.

On July 27, 2022, Sparrow filed the present suit asserting claims against WMATA under FMLA and D.C. wage laws. See Compl. [ECF No. 1]. WMATA answered the complaint on September 14, 2022. Answer [ECF No. 5]. Then, on October 17, 2022, Sparrow filed a Charge of Discrimination with the EEOC, premised largely on the same allegations as his initial EEOC inquiry—numerous issues with his pay, as well as disciplinary investigations and actions since taking parental leave in the summer and fall of 2020. Charge of Discrimination [ECF No. 19-14] at 1.[1] He asserted that the "pay issues [were] based on [his] gender, male, because [he] took parental leave and as such have led to unequal pay." Id. at 2. He further claimed that his supervisors made "remarks about [his] pay and [his] children" and that he "was told parental leave was not for men." Id. at 1. The record does not indicate what action, if any, the EEOC took on this charge.

On November 7, 2022, Sparrow moved to amend the complaint to strike the D.C. law claims and add federal claims under the EPA and Title VII. See Am. Compl. [ECF No. 12]. The amended complaint asserted that WMATA (a) violated the EPA and Title VII by allowing women to take more paid sick leave than men following a birth (Counts I & II); (b) retaliated against

---

[1] WMATA's statement of facts indicates this charge was filed with the EEOC on October 17, 2021. Def. SMF ¶ 15. However, the charging document indicates it was filed on October 17, 2022, as plaintiff admits. See Pl. SMF ¶ 15. Accordingly, the Court will treat October 17, 2022 as the operative date and disregard arguments based on the October 2021 date.

Sparrow in violation of the EPA and Title VII after he complained of discrimination to the EEOC (Counts III & IV); (c) interfered with Sparrow's right to take protected FMLA leave by misapplying Sparrow's accrued paid time off while he was on leave (Count V); and (d) discriminated against Sparrow in violation of the FMLA by misapplying his paid time off and retaliating against him for taking leave (Count VI). Id. ¶¶ 43–79.

The Court granted Sparrow's motion to amend. Nov. 8, 2022 Min. Order. WMATA answered the amended complaint the next day. Answer [ECF No. 13]. After discovery, WMATA filed a motion for summary judgment on all counts. Def. WMATA's Mot. for Summ. J. [ECF No. 19] ("Mot."). Sparrow opposed. Pl.'s Resp. in Opp'n to Mot. [ECF No. 20] ("Opp'n"). WMATA filed a reply. Def. WMATA's Reply to Opp'n [ECF No. 21] ("Reply"). The Court, having reviewed the parties' papers, sought supplemental briefing on a discrete set of issues raised by the case but not clearly addressed in the parties' initial briefing, including the statute of limitations applicable to Sparrow's Title VII claim, the evidence required to establish an EPA claim, and the factual and legal basis on which Sparrow's retaliation claims rest. Order [ECF No. 22]. The parties filed briefs responsive to the Court's Order. See Pl.'s Suppl. Br.; Def.'s Am. Suppl. Br. [ECF No. 25-1]. The Court held oral argument on June 13, 2024. The motion for summary judgment is now fully briefed and ripe for decision.

## **Legal Standard**

A moving party is entitled to summary judgment when the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a dispute of material fact is genuine when "the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party." Figueroa v. Pompeo,

923 F.3d 1078, 1085 (D.C. Cir. 2019) (quoting <u>Hairston v. Vance-Cooks</u>, 773 F.3d 266, 271 (D.C. Cir. 2014)).

When assessing a summary judgment motion, a court must be careful to neither "weigh the evidence" nor make determinations of witness credibility.  <u>See</u> <u>Anderson</u>, 477 U.S. at 249; <u>Robinson v. Pezzat</u>, 818 F.3d 1, 8 (D.C. Cir. 2016).  However, it takes more than "a scintilla of evidence" to overcome a motion for summary judgment; "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249, 252.  In short, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial" because the case turns on material disputes of fact that could be "resolved in favor of either party."  <u>Id.</u> at 250.

## Analysis

### I.    Title VII Discrimination Claim

Sparrow alleges that WMATA discriminated against him under Title VII by offering more generous leave benefits to women than men following the birth of a child.  Am. Compl. ¶¶ 49–52; <u>see</u> Opp'n at 7. [2]   Title VII and the Pregnancy Discrimination Act ("PDA") make it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," a term that includes "pregnancy, childbirth, or related medical conditions."   42 U.S.C. §§ 2000e(k) (Pregnancy Discrimination Act), 2000e-2(a)(1) (Title VII).  In Title VII/PDA cases, courts have held that an employer may not discriminate in the provision of parental leave benefits except for limited preferential treatment of female employees during the period of actual physical disability

---

[2] WMATA concedes that the Lilly Ledbetter Fair Pay Act, 42 U.S.C. § 2000e-5(e)(3), applies to this case and therefore Sparrow's Title VII claim is timely.  Def.'s Am. Suppl. Br. at 1 (citing <u>Johnson v. District of Columbia</u>, 632 F. Supp. 2d 20 (D.D.C. 2009)).  Because time limitations to contact the EEOC are not jurisdictional, the Court need not address the issue further.  <u>Bowden v. United States</u>, 106 F.3d 433, 437 (D.C. Cir. 1997).

associated with childbirth.  See Johnson v. Univ. of Iowa, 431 F.3d 325, 329 (8th Cir. 2005);

Schafer v. Bd. of Pub. Educ., 903 F.2d 243, 247–48 (3d Cir. 1990); see also California Fed. Sav.

& Loan Ass'n v. Guerra, 479 U.S. 272, 290 (1987) (upholding law providing leave to birth mothers

when, among other factors, the leave "cover[ed] only the period of actual physical disability on

account of pregnancy, childbirth, or related medical conditions"); Savignac v. Jones Day

("Savignac I"), 486 F. Supp. 3d 14, 33–38 (D.D.C. 2020) (denying motion to dismiss complaint

alleging discriminatory postpartum disability leave policy).

Johnson and Schafer illustrate the bounds of permissible leave policies.  In Johnson, a male

employee sued the University of Iowa, contending that the university violated Title VII by

allowing biological mothers (but not biological fathers) to take up to six weeks of accrued sick

leave after birth.  431 F.3d at 327.  According to the Eighth Circuit, to survive scrutiny under Title

VII, leave must be conferred for a "valid reason wholly separate from gender," such as providing

women a period of disability leave after childbirth.  Id. at 328.  Johnson argued that the policy—

although facially nondiscriminatory—nonetheless discriminated because the University did not

require childbearing women to provide any proof of disability when the leave taken was six weeks

or less.  Id. at 329.  The Eighth Circuit rejected this argument, granting summary judgment for the

university, because it was not unreasonable to establish a period of presumptive six-week disability

leave so as to avoid reviewing every employee's medical records.  Id.

By contrast, in Schafer, a man applied for but was denied one year of unpaid leave for

childbearing, which was routinely granted to women.  903 F.2d at 247.  The defendant school

district contended that allowing men but not women to take this leave was valid under Guerra

because the one-year period was "related to the conditions of pregnancy, childbirth or related

medical conditions."  Id. at 248.  The Third Circuit rejected this argument because there was no

requirement that a woman demonstrate ongoing disability, or that general medical evidence

suggested that the period of post-childbirth disability lasted one year.  Id.  Accordingly, the court

found that the policy violated Title VII.

Relying on Guerra and Johnson, the EEOC has released guidance articulating these same

principles:

> For purposes of determining Title VII's requirements, employers should carefully distinguish between leave related to any physical limitations imposed by pregnancy or childbirth (described in this document as pregnancy-related medical leave) and leave for purposes of bonding with a child and/or providing care for a child (described in this document as parental leave).
>
> Leave related to pregnancy, childbirth, or related medical conditions can be limited to women affected by those conditions.  However, parental leave must be provided to similarly situated men and women on the same terms.  If, for example, an employer extends leave to new mothers beyond the period of recuperation from childbirth (e.g. to provide the mothers time to bond with and/or care for the baby), it cannot lawfully fail to provide an equivalent amount of leave to new fathers for the same purpose.

EEOC, Enforcement Guidance on Pregnancy Discrimination and Related Issues § I.C.3 (June 25,

2015),   https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-

and-related-issues [https://perma.cc/JN27-8L3Q] (footnotes omitted).

According to the evidence in this case, WMATA bus operators and mechanics under the

Local 922 CBA—male and female—may take up to twelve weeks of unpaid, job-protected FMLA

leave for purposes of birth and bonding with a newborn child.  FMLA Policy §§ 5.01(b), 5.04,

5.08(a).  Childbearing women, but not men, are also entitled to take up to six months of unpaid,

but job-protected, leave after childbirth.  Local 922 CBA § 16(n) (providing that WMATA "shall

grant to employees up to six months of maternity leave following the date of childbirth"); id. § 9(b)

(stating that "female employees shall be granted maternity leave without loss of seniority"

provided they return to their positions "no later than six months after delivery"); see Def.'s Am.

Suppl. Br. at 3–4 (conceding that § 16(n) applies only to childbearing women).[3]  It is not clear from the record whether the maternity leave must be taken concurrent to the FMLA leave.

During the twelve-week FMLA leave or the six-month maternity leave, men and women are entitled to take two days of accrued sick leave to care for their child.  Local 922 CBA § 16(o).  After that, employees must use accrued vacation leave to the extent available or take unpaid leave to care for the newborn child.  See id. § 16(n) (providing that employees on maternity leave "may use available vacation and/or sick leave (if absence is for medical reasons)"); FMLA Policy § 5.08(a)(1)–(2).  But because WMATA considers women to be "sick" following childbirth, childbearing women are permitted to use additional, accrued sick leave during their six-month maternity leave on account of their own condition.  See Local 922 CBA § 16(n); FMLA Policy § 5.08(a)(1)–(2).  Up to this point, there appears to be little dispute.

Evidence in the record is conflicting as to what proof (if any) WMATA requires childbearing women to provide of their disability, and as to how long they are permitted to utilize sick leave after birth.  Consider the following exchange between Sparrow's counsel and designated Corporate Representative Arnetta Young.

> **Q:** Okay.  Are you aware of any female employees that take—or that use sick leave for more than two days after the birth of a child?
> **A:** Yes, because they are the ones that gave birth to the child.  So they can use their sick leave because it's for themselves.
> **Q:** And in terms of the sick leave for themselves, what type of documentation do they need to submit?
> **A:** They need to submit that they just gave birth to their child and the child, I guess—well, birth certificate.  They have the birth certificate of the child, yes.  That type of documentation.
> **Q:** So in order to use sick leave for up to six months a female employee can submit proof of birth?
> **A:** Yes.

---

[3] The provision of the Local 922 CBA which provides six months of <u>unpaid</u>, but job-protected, maternity leave to childbearing women, but not to men, may well independently violate Title VII.  However, at oral argument, Sparrow's counsel maintained that he was not directly challenging this provision because his harm arose from the differences in <u>paid</u> leave.  And, further, there is nothing in the record to suggest Sparrow wanted to take more than 12 weeks of leave or that he wanted to take any unpaid leave at all.  Accordingly, the Court will not rule directly on the legality of this provision of the Local 922 CBA.

**Q:** Are there any other documents that a female employee would need to submit in order to use her sick leave during that time?

**A:** Just proof of birth, and I guess they—normally where it comes from, it comes from where they had maybe the hospital in which they gave birth and the doctor and it's coming from the doctor, the time of birth, the birth of the child.

**Q:** Okay. Do they need to show—do they need to submit additional documentation showing that the birth was difficult or they had some other condition afterwards in order to use sick leave?

**A:** Yeah.  Because C-section is a little longer then just a normal birth.  So they can provide that information.  That they had a natural birth or a Caesarean.  C-section.

30(b)(6) Dep. of Arnetta Young [ECF No. 20-9] ("Young Dep.") at 25–27.  In another deposition,

Sharon James, Sparrow's supervisor, provided testimony suggesting that some documentation was

needed.

**Q:** Okay.  Do you know—and I don't want names of anybody but have you had female employees who've used sick time while on maternity leave?

**A:** Yes.

. . .

**Q:** Okay.  And so for maternity leave, would you say that's usually paid through sick leave then?

**A:** So WMATA doesn't pay maternity leave. . . . [but] they will allow you to use your sick leave or your vacation.

**Q:** And do they allow both men and women to choose between sick leave and vacation time?

**A:** So the only time that they can use their vacation—the only time they have used their vacation when they have exhausted all of their sick leave.  So when—when women go out on maternity leave—I mean, on sick leave, it's a sickness—it's a sick—it's a condition associated with the pregnancy.  So they provide medical documentation to OHAW.  OHAW says that's a work status, you know what I'm saying, that this—this employee has coverage from their doctors from April 1 to April 29, they could use their sick leave.  . . .

**Q:** So let me ask this: If you've got a female employee, for example, who does not have any complications prior to delivery.  When they go out on maternity leave, if they've got enough sick leave, is that all they use?

**A:** When they go out on maternity leave and if they have enough sick leave, is that all they use?  Yes.

. . .

**Q:** So for a female employee, let's assume that they have plenty of sick leave.  When they go out on maternity leave, are they able to use sick leave for the entire three months they're out?

**A:** Yes.

**Q:** . . . Do they have to do anything, other than submit for FMLA to get maternity leave and use their sick leave?

**A:** So this is for anybody that—that uses maternity leave, that's out on the doctor's care.  Our—our sick policy states that if you're out of work for more than three days, a doctor's certificate is required.  So any absence greater than three days, a doctor's certificate is required.  So if somebody go out on maternity leave and they're using their sick leave and they want to be paid their sick leave, we must have a doctor's certificate that says that Sharon James will be out of work from January 1 and she won't be back until April 15.  That's the only way that I could get paid my sick leave.  I can't just arbitrarily use it up because I said that I'm out, I have to have documentation which covers me.  So when somebody go out and they out within three days and they don't provide medical documentation, we don't pay him.  We turn it sick off.

Dep. of Sharon James [ECF No. 20-4] ("James Dep.") at 39–44.

Taken together, WMATA's policies, the provisions of the Local 922 CBA, and the deposition testimony of WMATA officials raise a genuine dispute of fact as to whether WMATA provides paid sick leave to women taking care of their newborn children, while denying the same leave to men.  A jury could conclude based on the evidence submitted that WMATA allows childbearing women to apply accrued sick leave for up to six months after childbirth with no requirement that they show continuing disability.  From that finding, a jury could conclude that WMATA allows childbearing women to use accrued sick leave when they are caring for their child—not for themselves—while denying men the same opportunity to use sick leave to care for newborn children.

This dispute of fact is material to the legal question whether WMATA's parental leave practices violate Title VII.  As discussed above, Title VII and the PDA permit preferential treatment of women following childbirth when it is based on a legitimate, gender-neutral reason, such as a woman's need to recover from the physical effects of childbirth.  However, preferential treatment is not allowed when its purpose is to provide childbearing women (but not men) with paid leave to care for or bond with their newborn child.  Such benefit must be provided equally to men and women.  Accordingly, if a jury were to conclude that WMATA allows women to take up

to six months of sick leave <u>to care for their</u> child, while men are limited to using just two days for the same purpose, this policy would violate Title VII.

WMATA seems to argue that, even construing the evidence in Sparrow's favor, WMATA has not violated Title VII because the policy is "in practice . . . a pregnancy disability leave provision." Def.'s Am. Suppl. Br. at 3. However, the Court cannot conclude based on the evidence that this is "a pregnancy disability leave provision," because the relevant provisions of the Local 922 CBA do not mention disability at all, and there is a genuine dispute as to whether, in practice, WMATA confines post-birth leave in that way. WMATA cites <u>Johnson</u> for the proposition that an employer may utilize a presumptive period of disability leave without requiring documentation. True enough, but that case involved a six-week leave. Nothing in the record suggests that women typically require six months to recover from childbirth. And, indeed, courts have generally held that post-pregnancy disability lasts only six to eight weeks, not six months. <u>See</u> <u>Savignac I</u>, 486 F. Supp. 3d at 36 (collecting cases).

WMATA further argues that the policy is not discriminatory because men and women are equally limited to taking two days of sick leave for a family member. <u>See</u> Local 922 CBA § 16(o). Any further leave must be charged to vacation or taken unpaid, except that a childbearing woman may take additional sick leave for herself following a pregnancy. As discussed above, there is a genuine dispute of material fact as to whether childbearing women are permitted under WMATA's practices to use accrued sick leave beyond any period of disability following pregnancy. In this way, the question whether men and women are really on par is not settled by the current record.

Finally, WMATA suggests that men and women are treated equally because a man could take six months of vacation if he had enough accrued. Def.'s Am. Suppl. Br. at 4. This argument is a red herring: the issue is whether a man can use sick leave to the same extent as a woman to care for his child, not whether a man can use other vacation time to do so. In sum, the Court

concludes that there is a genuine dispute of material fact as to whether WMATA has violated Title VII in its provision of paid leave following childbirth, and summary judgment will be denied on this claim.[4]

## II.     Equal Pay Act Discrimination Claim

Sparrow's claim under the EPA is functionally identical to his Title VII claim.  See Am. Compl. ¶¶ 43–48.  However, WMATA contends that, for reasons specific to the EPA, Sparrow's claim cannot stand.  Mot. at 5–7.  Specifically, WMATA argues that Sparrow cannot maintain an equal pay claim based on unequal leave benefits (as opposed to wages).  Id. at 6.  Moreover, WMATA argues that, in any event, Sparrow did not make out a prima facie case because he has not identified any comparator evidence of a female operator earning a higher wage than he earns. Id. at 6–7.  The Court considers each issue below.

### A.  Application of the EPA to Parental Leave Benefits

First, WMATA contends that Sparrow's claim must fail at the outset because the plain text of the statute refers to "wages," not "leave" or "benefits."  The Court disagrees.  The EPA prohibits employers from "paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," subject to certain exceptions.  29 U.S.C. § 206(d)(1).  While the text of the statute

---

[4] The parties have not briefed the case under the traditional framework of Title VII—considering whether there is direct or indirect evidence of discrimination, and, if the latter, applying the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Mot. at 1–2; Opp'n at 7; Def.'s Am. Suppl. Br. at 1–4.  Instead, they have generally invoked the principles arising from the limited case law concerning discrimination in parental leave.  The Court has followed this approach.  However, the same outcome would result from a more rigid application of the evidentiary framework.  Sparrow has submitted direct evidence that WMATA did not let him use sick leave benefits during his FMLA birth-and-bonding period because of his sex.  See Schafer, 903 F.2d at 247.  To the extent WMATA contends the reason for the denial was that Sparrow was not "sick," that is a disputed factual question.  And even under the McDonnell Douglas framework, Sparrow has submitted enough evidence to create a genuine issue as to whether WMATA's legitimate reason for differentiating—post-pregnancy disability—is pretext for discrimination on the basis of sex.

refers specifically to "wages," the EPA has long been interpreted to cover benefits as well.  See Opp'n at 6–7 (citing 29 C.F.R. § 1620.10).  Department of Labor regulations define wages, for purposes of the Equal Pay Act, to include "all payments made to [or on behalf of] an employee as remuneration for employment," including "fringe benefits." 29 C.F.R. § 1620.10.  Fringe benefits, in turn, include "medical, hospital, accident, life insurance and retirement benefits; profit sharing and bonus plans; leave; and other such concepts."  Id. § 1620.11 (emphasis added).  Hence, the Labor Department would consider it a violation of the EPA to "discriminate between men and women performing equal work with regard to [leave] benefits."  Id.

Courts have also construed the EPA to cover benefits.  For example, in Laffey v. Northwest Airlines, Inc., 567 F.2d 429 (D.C. Cir. 1976), the D.C. Circuit held that Northwest Airlines violated the EPA by furnishing single rooms to male employees and double rooms to female employees. Id. at 455 n.175.  Similarly, courts have held that company policies discriminating in the provision of health insurance benefits—for example, by extending family coverage automatically to men but only to women who are the head of their household—could violate the EPA.  See E.E.O.C. v. Fremont Christian Sch., 609 F. Supp. 344, 351 (N.D. Cal. 1984), aff'd, 781 F.2d 1362 (9th Cir. 1986).  And at least one court has concluded that maternity and pregnancy-related benefits are wages under the EPA.  E.E.O.C. v. Bell Atl. Corp., Civ. A. No. 97-6723 (DC), 1999 WL 386725, at *7 (S.D.N.Y. June 11, 1999).  The Court thus holds that unequal parental leave benefits, like wages, can support an EPA claim.  See also Savignac I, 486 F. Supp. 3d at 32–38 (proceeding, at motion to dismiss stage, on the assumption that unequal parental leave policies could support an EPA claim).

### B.  Prima Facie Case

Next, WMATA contends that Sparrow's EPA claim fails at summary judgment because he has not made out a prima facie case.  "To establish an Equal Pay Act violation, a plaintiff first

must allege (and later prove) a prima facie case." Johnson v. WMATA, Civ. A. No. 19-3534 (CRC), 2022 WL 4547527, at *2 (D.D.C. Sept. 29, 2022), aff'd, No. 22-7149, 2023 WL 2442222 (D.C. Cir. Mar. 6, 2023). "[A] prima facia EPA claim has two elements—unequal pay and working in a 'substantially similar' (i.e., substantially equal) job." Savignac v. Jones Day ("Savignac II"), 539 F. Supp. 3d 107, 116 (D.D.C. 2021). "Once a prima facie case has been made out, the defendant may rebut the showing of [job] equality, or assert one of the Act's [four] affirmative defenses." Goodrich v. Int'l Bhd. of Elec. Workers, 815 F.2d 1519, 1523 (D.C. Cir. 1987). Those defenses permit wage disparities based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

While the Supreme Court has instructed that the Equal Pay Act is "broadly remedial" and "should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve," Corning Glass Works v. Brennan, 417 U.S. 188, 208 (1974), the Court has also explained that relief under the EPA is substantially limited by its equal work requirement, Washington County v. Gunther, 452 U.S. 161, 178–79 (1981). Ordinarily, a plaintiff proves a prima facie case of wage discrimination under the EPA by identifying a specific comparator employee, or multiple comparator employees, receiving higher pay for substantially equal work. See Goodrich, 815 F.2d at 1524; EEOC Compliance Manual § 10-IV Compensation Discrimination in the Equal Pay Act, https://www.eeoc.gov/laws/guidance/section-10-compensation-discrimination [https://perma.cc/BVW2-ULT4]. However, plaintiffs have also succeeded in demonstrating a prima facie case when job classifications are segregated by sex, although requiring "substantially equal" work, and the jobs are paid differently. See, e.g., Corning Glass Works, 417 U.S. at 203–04; Laffey, 567 F.2d at 451.

Sparrow has not identified any female comparator who received a paid leave benefit that he was denied.  Nor has he provided evidence that his job classification is sex-segregated, and that members of his job classification receive fewer paid leave benefits.  Rather, Sparrow argues that he has satisfied the equal work requirement through evidence of the Local 922 CBA, which applies equally to men and women bus operators, except that the agreement provides maternity leave to childbearing women (but not men), and WMATA (allegedly) permits childbearing women (but not men) to take paid, sick leave to care for their children after birth.  See Pl.'s Suppl. Br. at 2 (describing situation as one under which "all fathers were treated differently from all mothers who sought parental leave and were subject to [the Local 922 CBA]").  Hence, the question for the Court is whether this type of evidence could satisfy a prima facie case of EPA wage discrimination.

WMATA argues that Sparrow's evidence is insufficient as a matter of law because he has not provided individual comparator evidence, which is the only way to establish a prima facie EPA case.  See Mot. at 5–6; Def.'s Am. Suppl. Br. at 4–5.  WMATA cites cases purportedly requiring individual comparator evidence.  For example, in Houck v. Virginia Polytechnic Institute and State University, 10 F.3d 204 (4th Cir. 1993), the Fourth Circuit held that statistical evidence of a "hypothetical male with a composite average of a group's skill, effort, and responsibility" could not alone satisfy a prima facie case absent specific comparator evidence.  Id. at 206.  However, those cases are somewhat inapposite because they concern the relationship between statistical evidence and individual comparator evidence, and whether statistical evidence, alone or in combination with individual comparator evidence, can support a prima facie case.  In such cases, the concern is whether statistical evidence blurs relevant differences between workers and fails to capture the essential element of equal work.

Sparrow argues that comparator evidence is not required where, as here, the plaintiff provided evidence that "all fathers were treated differently from all mothers who sought parental

leave and were subject to [the Local 922 CBA]."  Pl.'s Suppl. Br. at 2.  He points to the seminal case of Corning Glass Works, which concerned a manufacturer that employed only women to work as daytime inspectors and only men to work as nighttime inspectors.  417 U.S. at 191.  To fill those night inspector positions, the company offered applicants a "substantially higher" wage than that offered to women employed on the day shift.  Id.  "Thus a situation developed where the night inspectors were all male, the day inspectors all female, and the male inspectors received significantly higher wages." Id. at 192.  Because the evidence showed that the company considered the day and nightshift jobs as "equal in all respects," the Court held that the wage differential was illegal under the EPA.  Id. at 203–04.

While Corning Glass Works demonstrates that individual comparator evidence may not be required in every EPA case, it does not show that comparator evidence more broadly is nonessential.  Rather, the case demonstrates that an employer may not hide behind job classifications to justify different pay for men and women when, in fact, employees within those job classifications perform substantially equal work.  The D.C. Circuit has performed a similar analysis in cases concerning sex-segregated work with pay differentials, analyzing whether certain categories of jobs, historically segregated by sex, were materially similar, although dissimilar in terms of pay.  See Laffey, 567 F.2d at 451 (concluding that airline pursers and stewardesses performed substantially equal work); Thompson v. Sawyer, 678 F.2d 257, 274–76 (D.C. Cir. 1982) (concluding that operators of the Smyth sewing machine and some bookbinders performed substantially equal work).

While the evidence here (regarding the Local 922 CBA) does not appear to be a common mode of proof in EPA cases, the Court finds it sufficient to defeat summary judgment.  The CBA plainly covers a class of workers, including Sparrow, who are known as "operators" or "bus operators."  See, e.g., Local 922 CBA at 23; Rough H'rg Tr. at 25.  WMATA seems to admit that

other operators would be the appropriate comparators in this case.  See Mot. at 6 ("Plaintiff doesn't allege that he was paid a lower wage than his Local 922 female bus operator counterparts and offers no evidence, especially any comparator evidence, of any female Local 922 bus operator who recently gave birth having a higher wage than Plaintiff.").  And WMATA does not argue that Sparrow performs different work from other bus operators covered by the Local 922 CBA so as to make them inappropriate comparators.  Further, the Court can infer from the deposition testimony of Sharon James, Sparrow's supervisor in the Landover Bus Division, that women are also employed as bus operators and subject to the disputed parental leave policies and practices in this case.  See James Dep. at 39–44 (describing sick leave policies for employees following the birth of a child); Decl. of Sharon James [ECF No. 19-2] ("James Decl.") ¶ 3 (describing herself as the former supervisor of the Landover Bus Division).

This is a close decision, which the Court may ultimately revisit depending on the evidence elicited at trial.  As the Supreme Court has recognized, evidence of "equal work" is essential to an EPA claim, and an EPA claim might fail where a Title VII claim succeeds if an employee does not show that an employment practice affects individuals performing "equal work."  See Washington County, 452 U.S. at 178–79 (explaining that "if an employer used a transparently sex-biased system for wage determination, women holding jobs not equal to those held by men" cannot sue under the EPA); id. at 179 (noting that "if the employer required its female workers to pay more into its pension program than male workers were required to pay, the only women who could bring [an EPA] action . . . would be those who could establish that a man performed equal work").  However, where the Court is presented with evidence that an allegedly discriminatory policy is applied to men and women performing equal work as bus operators, WMATA has not met its burden to show that it is entitled to summary judgment.

Finally, as the Court explained in relation to the Title VII claim, there is a material dispute of fact as to whether WMATA provides paid parental benefits to childbearing women that it denies to childbearing men under the Local 922 CBA.  Accordingly, the Court finds a corresponding dispute of fact as to whether women bus operators are paid equally (in terms of benefits) to male bus operators subject to the Local 922 CBA.  For these reasons, the Court will deny summary judgment on the EPA claim.[5]

### III.      Title VII & EPA Retaliation Claims

Sparrow's second set of claims, again under Title VII and the EPA (and more broadly, the Fair Labor Standards Act ("FLSA")), alleges that WMATA retaliated against him for complaining about the policies he viewed as discriminatory.  Both Title VII and the FLSA, of which the EPA is part, protect employees from retaliation when they complain about their employer's allegedly discriminatory practices.  See 42 U.S.C. § 2000e-3(a) (Title VII); 29 U.S.C. § 215(a)(3) (FLSA/EPA).  The framework for establishing a prima facie case of retaliation under Title VII or the FLSA follows the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The plaintiff must show (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) a causal link between the protected activity and the adverse action.  See Ho v. Garland, 106 F.4th 47, 51 (D.C. Cir. 2024)

---

[5] As noted at the motions hearing, the Court has also considered the Eleventh Circuit's decision in Beavers v. American Cast Iron Pipe Co., 975 F.2d 792 (11th Cir. 1992), a case not raised by either party.  There, the Eleventh Circuit considered a company policy of providing health insurance to employees' children only when the children resided full- or part-time with the employee.  Id. at 794.  Male employees sued, alleging that because men have historically been awarded child custody less frequently than women, they suffered a disparate impact from the company's policy and made out a claim under the EPA.  Id. at 794–95.  The employees argued that they did not need to provide comparator evidence, because the company did not "distinguish among different positions in distributing the benefit, . . . [and, hence,] they should be deemed to have satisfied the equal skill, effort, and responsibility requirement of a prima facie case."  Id. at 801.  The court disagreed, explaining that the scope of the EPA is "much more limited than that of Title VII."  Id. (citing Washington County, 452 U.S. 161).  While "the plaintiffs may be able to establish a violation of Title VII, which is not expressly limited to cases involving equal work," the court could not "simply ignore the statutory requirement" of equal work in the EPA.  Id.  This Court ultimately concludes that Beavers is distinguishable because evidence of the Local 922 CBA provides some support for the position that women in a comparable position to Sparrow receive more generous parental leave benefits than he did.

(Title VII); Hicks v. Ass'n of Am. Med. Colleges, 503 F. Supp. 2d 48, 51 (D.D.C. 2007) (FLSA/EPA).

A prima facie showing raises a "rebuttable presumption of unlawful discrimination." Smith v. District of Columbia, 430 F.3d 450, 455 (D.C. Cir. 2005) (internal quotation marks omitted). However, if the employer articulates a legitimate, nondiscriminatory reason for its actions, "the presumption raised by the prima facie case is rebutted and drops from the case." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (internal citation and quotation marks omitted). The focus of the inquiry shifts to the "ultimate issue of retaliation vel non." Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009). "[T]he only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation 'either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Id. (quoting U.S. Postal Serv. Bd. v. Aikens, 460 U.S. 711, 716 (1983)). "[T]he court reviews each of the three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer retaliation." Id. at 679 (quoting Waterhouse v. District of Columbia, 298 F.3d 989, 996 (D.C. Cir. 2002)).

### A. Protected Activity

Sparrow claims that he engaged in protected activity for purposes of his Title VII claim by filing an inquiry with the EEOC on June 21, 2021. In that inquiry, Sparrow complained of retaliation for taking parental leave following the birth of his child and of numerous alleged pay reductions on account of that leave. See June 2021 EEOC Charge at 3. While his wording may be somewhat ambiguous as to whether he complained specifically of conduct allegedly violating Title VII and the EPA, see Mot. at 11, Sparrow was not required to use "magic words" to put WMATA on notice of his concerns, see Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir.

2006).  And the EEOC clearly understood his complaints this way: in the notice of charge sent by the EEOC to WMATA on September 2, 2021, the EEOC described Sparrow as alleging discrimination under Title VII and the EPA.  See June 2021 EEOC Charge at 10.  The Court, therefore, concludes that Sparrow engaged in protected activity when he contacted the EEOC with his concerns on June 21, 2021.  See Smith, 430 F.3d at 455; Cooke v. Rosenker, 601 F. Supp. 2d 64, 75 (D.D.C. 2009); Reddish v. Washington Metro. Area Transit Auth., Civ. A. No. 22-2658 (RDM), 2023 WL 5289290, at *5.[6]

### B.  Retaliation

The question then becomes whether Sparrow suffered any materially adverse action as a retaliation for his EEOC complaint.  Under the Supreme Court's decision in Burlington Northern & Santa Fe Railway Co. v. White ("BNSF"), 548 U.S. 53 (2006), a materially adverse action is one that could have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  Actions taken together may be "materially adverse" even though each might not suffice on their own.  See Mogenham v. Napolitano, 613 F.3d 1162, 1166 (D.C. Cir. 2010).

WMATA claims that the "only possible employment decision that qualifies as materially adverse" is the three-day suspension following the OIG investigation.  Mot. at 8.  Because WMATA does not make any further arguments in its reply brief, the Court understands WMATA to be arguing that none of the other incidents Sparrow describes in his opposition brief state a prima facie case of retaliation.  Sparrow, on the other hand, claims that the following series of

---

[6] In his supplemental brief, Sparrow also identified his July 2020 email requesting FMLA leave as protected activity.  Pl.'s Suppl. Br. at 4–5.  Sparrow's counsel clarified at oral argument that this was protected activity only as to Sparrow's claim of FMLA retaliation, not as to his claim of Title VII/EPA retaliation.  Separately, in his initial opposition brief, Sparrow also asserted that a "January email was protected activity under the FLSA as a matter of law."  Opp'n at 12.  However, when the Court asked Sparrow to provide supplemental briefing on the "specific protected activity" he relies on to support his retaliation claims, he did not make any further reference to this January email.  See Pl.'s Suppl. Br. at 4–5.  And the Court has been unable to find any email meeting this description in the record.  Lastly, the Court also notes that Sparrow does not claim that his complaint to the OIG was protected activity.

actions, taken from July 1, 2020, through February 2022, "are both retaliatory and taken together, support a pattern of antagonism indicating that the three-day suspension was also retaliatory." Pl.'s Suppl. Br. at 4; see Opp'n at 12.

> (a) the paychecks with irregular adjustments and $0.00 or negative balances from September 30, 2020, through May 26, 2021;
> (b) being improperly marked as being on "leave without pay" on multiple occasions;
> (c) being placed under investigation for taking time to appear for court in January or February 2021;
> (d) receiving a suspension for making a report to the OIG around August 2021;
> (e) failing to receive a November 2021 raise until February 2022;
> (f) being placed in an attendance program and urged to sign warning paperwork for attendance violation; and
> (g) receiving a three-day suspension following the OIG Report on November 12, 2021.

See Opp'n at 12–13.

The Court begins with the suspension following the OIG Report and then turns to the other events. Recall that Letroy Baker, the Superintendent of Bus Service Operations, issued Sparrow a three-day suspension on November 12, 2021. Memorandum at 2–3; see OIG Report at 2. WMATA contends that this three-day suspension was independently warranted and nonretaliatory because Sparrow surreptitiously recorded his supervisors in violation of WMATA policy. Mot. at 11. Indeed, WMATA's explanation is more than a proffer. The agency has provided an OIG Report concluding that Sparrow surreptitiously recorded his supervisors in potential violation of WMATA's internal policies. OIG Report at 1–2; Mot. at 11. WMATA has further provided a written reprimand, which identifies the surreptitious recording as the reason for the disciplinary action. Memorandum at 1.

"Where, as here, 'an employer asserts a legitimate, nondiscriminatory reason for an adverse employment action,' the remaining question is 'whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited

24

basis.'"  <u>Minter v. District of Columbia</u>, 809 F.3d 66, 71 (D.C. Cir. 2015) (quoting <u>Adeyemi v.</u> <u>District of Columbia</u>, 525 F.3d 1222, 1226 (D.C. Cir. 2008)).  Sparrow's counsel contended at oral argument that retaliation can be inferred from the temporal proximity between the filing of the EEOC complaint and the suspension.  A causal connection can be established "by showing that the employer had knowledge of the employee's protected activity, and that the adverse [] action took place shortly after that activity."  <u>Mitchell v. Baldrige</u>, 759 F.2d 80, 86 (D.C. Cir. 1985). Although there is no bright-line rule, the Supreme Court has recognized that cases inferring causation from temporal proximity must be "very close," citing approvingly cases with three- to four-month intervals.  <u>See</u> <u>Pueschel v. Chao</u>, 955 F.3d 163, 167 (D.C. Cir. 2020) (quoting <u>Clark</u> <u>Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)).  The four-and-a-half-month gap here is at the outer bounds, but it still provides some evidence supporting an inference of causation.  <u>See</u> <u>id.</u> (citing D.C. Circuit cases finding causation based on temporal proximity of three to five months).

However, "when an employer comes forward with a legitimate, nonretaliatory reason for an employment action, 'positive evidence beyond mere proximity' is required "to create a genuine issue of material fact concerning whether the motive for [an adverse employment action] was . . . retaliation."  <u>Minter</u>, 809 F.3d at 71–72 (quoting <u>Solomon v. Vilsack</u>, 763 F.3d 1, 16 (D.C. Cir. 2014)).  The evidence presented here cannot overcome WMATA's nonretaliatory reason for the discipline for multiple reasons.

First, while the court can infer from the fact that the EEOC charge was shared with WMATA prior to the suspension (in September 2021) that the supervisor who issued the suspension was aware of the charge, <u>see</u> <u>Jones</u>, 557 F.3d at 679, Sparrow has not provided any evidence suggesting that the supervisor was "involved in or targeted by the prior complaint," which "weakens an inference that the decisionmaker might have retaliatory animus," <u>Ho</u>, 106 F.4th at 53.

Second, although Sparrow contends that WMATA engaged in a "pattern of antagonism" against him, from which retaliatory intent for the suspension can be inferred, the evidence here does not support it.  A "plaintiff can establish a link between his or her protected behavior and [the alleged reprisal] if the employer engaged in a pattern of antagonism in the intervening period." Taylor v. Solis, 571 F.3d 1313, 1323 (D.C. Cir. 2009) (quoting Woodson v. Scott Paper Co., 109 F.3d 913, 920–21 (3d Cir.1997)); see Walker v. England, 590 F. Supp. 2d 113, 140 (D.D.C. 2008). But here, among his list of purportedly retaliatory actions, hardly any took place within the period between his EEOC inquiry and the suspension following the OIG Report.  The only actions taken in the relevant period are the August 2021 suspension for making a report to the OIG and possibly his placement in an attendance program.  However, even if Sparrow were suspended in August 2021 (an assertion supported only by Sparrow's declaration), this suspension does not itself establish a pattern of antagonism suggesting retaliation for filing an EEOC complaint.  Further, the evidence of placement in an attendance program does not add much at all, since Sparrow has not identified any date on which he was reprimanded, or placed into an attendance program, and the Court cannot simply assume it occurred during the relevant period.  Ultimately, Sparrow has not created a genuine dispute of material fact as to whether his EEOC charge "more likely motivated" WMATA than did the surreptitious recording, nor that WMATA's "explanation is unworthy of credence."  Jones, 557 F.3d at 678 (quoting U.S. Postal Serv. Bd., 460 U.S. at 716).

The Court also cannot conclude that a genuine dispute of material fact exists as to whether the list of actions was retaliatory, taken individually or together.  To begin, the actions preceding the EEOC complaint cannot be retaliatory in violation of Title VII and the EPA because "no event that preceded [the date of protected activity] can constitute an adverse action for the purposes of [plaintiff's] prima facie case of retaliation."  Cooke, 601 F. Supp. 2d at 76.  Hence, Sparrow's contention that paycheck issues from July 1, 2020, through May 26, 2021, were retaliatory must

fail because they preceded the statutorily protected action of filing a complaint with the EEOC on June 21, 2021, and therefore could not be retaliation for taking protected action. See id. The same goes for the "investigation" of Sparrow following his decision to take leave to attend court hearings in January and February 2021. See id. at 13.

With respect to the contentions that followed his EEOC complaint—that Sparrow was improperly marked as being on "leave without pay" on multiple occasions; received a suspension for making a report to the OIG around August 2021; failed to receive a November 2021 raise until February 2022; was placed in an attendance program and urged to sign warning paperwork for attendance violation—it is not apparent that any of these actions, alone or together, is "materially adverse" under the standard set forth in BNSF. 548 U.S. at 68. And, in any event, Sparrow has not provided sufficient evidence permitting the Court to infer that these actions were taken in retaliation for his complaint to the EEOC. As noted above, Sparrow has not indicated when he was placed in an attendance program or what connection that had to his FMLA leave. As to being improperly marked as taking leave without pay, Sparrow also does not provide enough specificity or support to create a genuine dispute of material fact as to whether these actions were retaliatory. He has not identified on what days he was marked as being on leave without pay "improperly," versus being so marked because he previously used up his vacation days—which would be "merely [his] discrimination claim[] with new labeling." Mayers v. Laborers' Health & Safety Fund of N.A., 478 F.3d 364, 369 (D.C. Cir. 2007), abrogated on other grounds by Green v. Brennan, 578 U.S. 547 (2016). Indeed, he suggests elsewhere that he received no pay because he previously used up his vacation time while on FMLA leave. See Opp'n at 10. Nor do the cursory assertions relating to an August 2021 suspension or the failure to issue a raise meet the standard required to survive summary judgment. On this record, Sparrow has not raised a genuine issue of material

fact as to his Title VII and EPA retaliation claims.  Accordingly, the Court will grant summary judgment to WMATA on Sparrow's Title VII and EPA retaliation claims.

## IV.   FMLA Discrimination & Interference Claims

Sparrow's final pair of claims concern his requests to take FMLA leave around the birth of his child.  Sparrow claims that WMATA interfered with his right to take FMLA leave and retaliated against him for doing so.

### A.   FMLA Interference

Under the FMLA, it is unlawful for an employer to "interfere with, restrain, or deny the exercise" of FMLA rights.  29 U.S.C. § 2615(a)(1).  "To prevail on an FMLA interference claim, a plaintiff must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference."  Waggel v. George Washington Univ., 957 F.3d 1364, 1376 (D.C. Cir. 2020).  "[A]n employer action with a reasonable tendency to 'interfere with, restrain, or deny' the 'exercise of or attempt to exercise' an FMLA right may give rise to a valid interference claim under § 2615(a)(1) even where the action fails to actually prevent such exercise or attempt."  Gordon v. U.S. Capitol Police, 778 F.3d 158, 165 (D.C. Cir. 2015).  However, some evidence of prejudice is needed, and remedies must be "tailored to the harm suffered."  Waggel, 957 F.3d at 1377 (quoting Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)); see Gordon, 778 F.3d at 166.

Sparrow's FMLA interference claim is premised on the series of irregular paystubs he received while out on FMLA leave in September and October of 2020.  Sparrow asserts that WMATA interfered with his FMLA leave by "repeatedly chang[ing] [his] hours and dock[ing] his pay," and that his "paychecks were missing payment, and sixteen days of vacation were taken without his consent."  Opp'n at 14; see Am. Compl. ¶ 66.  The result of the pay issues, according to Sparrow, is that he returned to work earlier than he otherwise would have.  See Sparrow Dep.

at 43 ("I only came back [from FMLA leave] because I noticed that my leave was being depleted."). Indeed, Sparrow cut his FMLA leave short by about three weeks. See Def. SMF ¶ 10.

WMATA responds that the agency's conduct cannot be considered "interference" because Sparrow had no right to paid leave under the FMLA. Mot. at 12–13; Def.'s Am. Suppl. Br. at 5–6. To the extent that, during his parental leave, Sparrow learned that he would not receive sick pay, WMATA argues that this application of WMATA policy cannot support relief. Accordingly, Sparrow was not "denied" any FMLA right when he was not paid during his FMLA leave. In support of this argument, WMATA cites Becknell v. University of Kentucky, 383 F. Supp. 3d 743 (E.D. Ky. 2019), which held that an employer's refusal to pay an employee on FMLA leave did not deny the employee "FMLA benefits to which she was entitled" because the "FMLA does not provide employees any right to use paid leave while on FMLA leave." Id. at 757.

WMATA is certainly correct that it was not required, under the statute, to provide Sparrow with any paid leave under the FMLA. 29 U.S.C. § 2612(d)(1). However, Sparrow's claim is something more than that he was not paid during his FMLA leave. WMATA sent Sparrow several pay stubs during his FMLA leave that included "irregular adjustments," pay stubs for $0.00, and pay stubs suggesting negative balances. See Opp'n at 14 (citing Pl.'s SMF ¶¶ 42–51). These actions might be construed by a jury to go beyond merely not paying Sparrow during his FMLA leave. A reasonable jury could conclude that the pay issue had a "reasonable tendency" to deter Sparrow from taking his protected leave. See Gordon, 778 F.3d at 165; McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 7 (D.C. Cir. 2010). This conclusion might specifically be warranted if the jury concluded that Sparrow thought he was being charged for taking leave or that vacation leave was being used against his wishes. See Pl.'s Suppl. Br. at 4. Further, a jury could find that prejudice resulted if Sparrow returned to work early, losing out on his FMLA entitlement, due to WMATA's actions. Of course, a reasonable jury might also

conclude, as WMATA contends, that Sparrow belatedly realized he was not entitled to take his sick pay while on FMLA leave for his child and came back early for that reason.  But a conclusion in favor of either argument should be left to the jury.

WMATA further argues that Sparrow's theory is untenable because he has not shown that WMATA officials <u>intended</u> to discourage him from taking leave.  WMATA claims that Sparrow's leave was first inadvertently miscoded as "Family Medical Leave Sick," when it should have been coded as "Family Medical Leave Vacation," resulting in the pay discrepancies.  <u>See</u> Mot. at 12–13; James Decl. ¶ 7.  Sparrow does not accept WMATA's explanation because, in his view, "it does not explain why he received 'negative paychecks.'"  Pl.'s Suppl. Br. at 5.  However, Sparrow provides no evidence, other than the paychecks themselves, to suggest that WMATA altered his paychecks to discourage him from taking FMLA leave.

The D.C. Circuit has reserved on the question whether an employee can establish a FMLA interference claim without proof that such interference was intentional.  <u>Gordon</u>, 778 F.3d at 165.  However, at least three circuits have held that proof of an employer's subjective intent is not required to prove FMLA interference.  <u>See</u> <u>Mellen v. Trs. of Boston Univ.</u>, 504 F.3d 21, 26 (1st Cir. 2007); <u>Smith v. Diffee Ford-Lincoln-Mercury, Inc.</u>, 298 F.3d 955, 960 (10th Cir. 2002); <u>King v. Preferred Tech. Group</u>, 166 F.3d 887, 891 (7th Cir. 1999).  Their reasoning—which the Court adopts—is that, because the FMLA creates an entitlement, when an employee is deprived of this entitlement she has been harmed—regardless of the employer's intent.  <u>See</u> <u>King</u>, 166 F.3d at 891.  Here, if Sparrow's theory is proven correct, he too would have been deprived of leave to which he was entitled due to WMATA's interfering actions.  Accordingly, the Court will deny summary judgment on Sparrow's FMLA interference claim.

### B. FMLA Retaliation

Lastly, WMATA contends that it is entitled to summary judgment on Sparrow's FMLA retaliation claim because "there are nonretaliatory reasons for all the actions taken . . . and a vast majority of [Sparrow's] later discipline lacks a causal nexus."  Mot. at 13.

"[A] plaintiff may bring retaliation claims under § 2615(a)(1) by alleging an employer discriminated against her for taking FMLA leave."  Waggel, 957 F.3d at 1375; see Gordon, 778 F.3d at 207.[7]  FMLA retaliation claims—like the Title VII and EPA retaliation claims discussed above—are analyzed under the McDonnell Douglas framework.  Waggel, 957 F.3d at 1375; see Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1367–68 (D.C. Cir. 2000).  "To establish a prima facie case of FMLA retaliation, a plaintiff must show (1) the exercise of protected FMLA activity; (2) an adverse employment decision; and (3) a causal connection between the protected activity and the adverse action."  Waggel, 957 F.3d at 1375.  An employer can rebut a prima facie case with evidence of a "legitimate, nonretaliatory reason for the adverse action."  Id.  The D.C. Circuit has reserved on the question whether adverse action for purposes of a FMLA retaliation claim must be "materially adverse," such that the action is one that could have "dissuaded a reasonable worker from making or supporting a charge of discrimination," BNSF, 548 U.S. at 68, or whether a "lower standard might govern," Waggel, 957 F.3d at 1375.  However, that court has recognized the "overwhelming consensus among [other] circuits that FMLA retaliation claims are governed by the Title VII standard."  Id.

---

[7] Sparrow's amended complaint alleges a violation under 29 U.S.C. § 2615(a)(2), which prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by [FMLA]."  However, the allegations in the amended complaint are more likely cognizable under § 2615(a)(1), which the D.C. Circuit has interpreted to provide a cause of action for employees who face retaliation for taking or requesting FMLA leave.  See Waggel, 957 F.3d at 1375.  In his opposition to WMATA's motion for summary judgment, Sparrow suggests he might also be relying on his opposition to WMATA's policies, noting evidence in the record that he had "multiple conversations" with his supervisors "regarding his request to use sick leave instead of vacation" and that he "raised concerns about being treated differently in terms of leave" as a man.  Opp'n at 14; see Gordon, 778 F.3d at 162; Deloatch v. Harris Teeter, Inc., 797 F. Supp. 2d 48, 68 (D.D.C. 2011).  In any event, the analysis is the same with respect to the retaliatory acts.

Recall that Sparrow requested FMLA leave on July 2, 2020, which Sparrow contends (and WMATA does not dispute) is protected activity under the Act.  See Pl.'s Suppl. Br. at 4–5. Sparrow asserts that after he made his request for FMLA leave, WMATA "repeatedly changed his hours and docked his pay."  Opp'n at 14.  He further suggests that all the actions discussed above with respect to his Title VII and EPA retaliation claims are relevant to retaliation here.  Id. (asserting that Sparrow's "retaliation claims are all interconnected and stem from the same underlying facts").

The Court begins with the various issues Sparrow had with his paychecks during the FMLA leave.  WMATA has proffered a nondiscriminatory reason for the paycheck issues: WMATA was applying its FMLA policy and miscoded his leave before correcting the issue.  Mot. at 14; Def.'s Am. Suppl. Br. at 5.  Sparrow disputes this explanation but does not cite any evidence suggesting that it is pretext.  See Opp'n at 14; Pl.'s Suppl. Br. at 5.  And unlike the interference claim premised on these same pay discrepancies, Sparrow cannot survive summary judgment on this retaliation claim without some evidence to suggest that WMATA's actions were taken with the intent to retaliate against him.  See Mellen, 504 F.3d at 26.

Sparrow also claims that he was marked as being on "leave without pay" as retaliation for requesting FMLA leave.  See Opp'n at 14.  WMATA provides non-discriminatory reasons for two dates on which he was so marked.  WMATA asserts that Sparrow did not request to use his vacation leave on November 6, 2020, and that he lacked an "emergency leave bank balance" to cover his absence on December 31, 2020.  Mot. at 14; see James Decl. ¶¶ 8–9.  In his deposition, Sparrow stated that November 6 "was a made up day.  Around that time, they made up a day that my grand or aunt had died, and they put that in the system themselves.  I had nothing to do with that day."  Sparrow Dep. at 79.  However, Sparrow was unable to articulate in his deposition whether this absence was in fact covered by his FMLA leave, and his attendance record does not

indicate that he was marked as leave without pay on that date.  See id. at 73–74; Attendance

Records at *5.  As for December 31, Sparrow stated that "I probably wasn't at work that day" and

acknowledged that his FMLA leave had run out by that time.  Id. at 73, 79.  And, indeed, his

attendance records indicate that he took emergency, unscheduled leave due to COVID-19 exposure

on that date.  See Attendance Records at *44.  The evidence thus does not suggest that WMATA's

reasons were pretextual.  As noted above, Sparrow does not identify on what other days he was

improperly marked as leave without pay, and the Court cannot conclude from his vague assertions

that he has created a genuine issue of fact.[8]

WMATA contends that any later discipline is too remote to establish an inference of

retaliation.  Mot. at 14–15.  Sparrow does not respond to this argument at all.  See Opp'n at 14.

Indeed, the investigation for taking leave to appear in court in January or February 2021, the

alleged suspension for reporting to OIG in August 2021, the lack of a raise in November 2021, the

attendance program, and the three-day suspension following the OIG Report all trail the request

for FMLA leave by at least several months.  See id. at 12–13.  Even assuming these actions are

sufficiently adverse to support a FMLA retaliation claim, Sparrow does not elaborate at all on why

the Court should find these to be retaliation for his FMLA request.  Accordingly, the Court cannot

conclude that Sparrow has raised a genuine issue of material fact as to his FMLA retaliation claim,

and summary judgment will be granted to WMATA.

## V.    Joinder of Local 922

Having concluded that three of Sparrow's claims will survive the motion for summary

judgment, the Court turns to one final issue raised by WMATA: whether Sparrow's union, Local

---

[8] During his deposition, Sparrow also asserted that he was improperly marked as leave without pay in early 2021 and in April 2021.  See Sparrow Dep. at 78–80.  Yet these markings, too, are rebutted by the evidence in his attendance records, which indicate he sought leave in early 2021 to attend a court hearing unrelated to his work at WMATA and that in April 2021 he sought emergency leave to care for his daughter.  See Attendance Records at *41–43, *51.  And, in any event, those events were months removed from his request for FMLA leave, rendering their connection to the request doubtful.

922, must be joined in this case.  In its motion, WMATA makes a cursory argument that Sparrow has not made a "viable claim" under Title VII or the EPA because he failed to join Local 922. WMATA claims that Local 922 is a required party because "what [Sparrow] is really challenging is the existence of the maternity leave policy in his union's CBA."  Mot. at 7 & 8 n.2.

Under the Federal Rules of Civil Procedure, "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if . . . in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).  If a required party has not been joined, "the court must order that the person be made a party."  Fed. R. Civ. P. 19(a)(2).  Courts have generally held that a union is a required party to an employment discrimination case when the plaintiff challenges terms of the CBA.  See Lane v. J.H. Haynes Elec. Co., Inc., Civ. A. No. 12-381 (LG/JMR), 2013 WL 1310676, at *2–3 (S.D. Miss. Mar. 28, 2013) (collecting cases); Wright & Miller, Federal Practice & Procedure § 1620 (3d ed.).  But where the party's challenge is targeted at the employer's administration of the CBA, the union is not generally a required party.  See Brum v. County of Merced, Civ. A. No. 12-1636 (AWI), 2013 WL 2404844, at *6–11 (E.D. Cal. May 31, 2013).

While this is a close question, the Court does not find that Local 922 is a required party in this litigation.  Sparrow's Title VII claim arises from the interrelationship between the Local 922 CBA and WMATA's internal policies.  The Local 922 CBA includes the challenged provision that offers maternity leave only to childbearing women employees.  That provision sets the stage for WMATA to allow Local 922 female employees to use up to six months of sick leave.  But principally at issue in this case is WMATA's application of that provision in conjunction with its sick leave policies.  After all, Sparrow's complaint is that he was not paid during his leave, not that he wished to take more than the 12 weeks of leave to which he was already entitled under WMATA's policies.  And, at the motions hearing, Sparrow's counsel clarified that her client is

not directly challenging any provision of the collective bargaining agreement.  Rough Hr'g Tr. at 30.

Further, Sparrow does not seek injunctive or declaratory relief against WMATA or Local 922.  Rather, he only seeks "unpaid wages in such an amount to be proven at trial, plus liquidated damages as provided by statute), compensatory damages, interest (both pre- and post-judgment), attorney's fees, costs, and any other and further relief this Court deems appropriate."  Am. Compl. at 12.  Hence, "complete relief" could be accorded without the participation of the union.

However, given the relevance of the CBA's terms to Sparrow's claims and the potential for future litigation involving Local 922, the Court will order Sparrow to provide Local 922 with notice of this action, including a copy of his amended complaint, this Memorandum Opinion, and the accompanying Order, so that the union might evaluate its interest in the litigation and, if appropriate, move to intervene.

## Conclusion

For the reasons stated above, the Court will grant summary judgment to WMATA on Sparrow's retaliation claims but deny summary judgment on Sparrow's Title VII and EPA discrimination claims and on his FMLA interference claim.  An Order consistent with this Memorandum Opinion will issue on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: July 26, 2024